IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DIANE MAXSON,**

        **Plaintiff,**

  v.                              **Civil Action 2:20-cv-354**
                                     **Judge Sarah D. Morrison**
                                     **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Diane Maxson, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff protectively filed her application for DIB on July 9, 2015, alleging that she was disabled beginning January 31, 2012. (Tr. 257–63). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on November 1, 2017. (Tr. 68–103). On March 2, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 139–58). Upon request for review by the Plaintiff, the Appeals Council remanded the case back to the ALJ on April 27, 2018. (Tr. 159–63). A subsequent hearing was held on November 6, 2018. (Tr. 39–67).

On December 5, 2018, the ALJ issued a partially favorable decision; although Plaintiff

argued that she was disabled since January 31, 2012, the ALJ found that she was not disabled until February 19, 2018. (Tr. 14–38). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3–8).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 22, 2020 (Doc. 1), and the Commissioner filed the administrative record on March 23, 2020 (Doc. 5). This matter is fully briefed and ripe for consideration.

**A. Relevant Hearing Testimony**

The ALJ summarized the testimony from Plaintiff's hearing:

With respect to the nature of the claimant's symptoms, precipitating and aggravating factors, the medications taken and any side-effects, and other measures used to relieve the symptoms, the claimant testified at her November 6, 2018 disability hearing, that she had additional back surgery in February 2018. Her hospitalization included intensive care treatment due to uncontrolled blood sugars. Since that time, her pain has increased in her shoulders and left hand, which is her dominant hand. She has constant headaches and shooting pain in her arms. Her headaches were present prior to surgery but not as severe. She drives very little now, as she is unable to turn her head. She wears a soft neck brace in the car and cannot drive long distances. She testified that she had constant left-hand pain and swelling, which made it difficult for her to hold a pan. The wrist and palm were painful, as were the thumb, index, and middle fingers. Her right shoulder now swells and is painful. She is unable to use a computer keyboard. Pain medications included tramadol and gabapentin, but nothing makes her pain better. When she has a headache, she cannot tolerate sound. Wet weather bothers her a lot.

When asked about an apparent discrepancy between the statements by the claimant's primary care physician, Ambareen Bharmal, M.D., and records from the Ohio State University Medical Center, the claimant said that reports from OSU providers indicating that she was doing better were inaccurate, and she had sent multiple messages to the physician portal complaining of pain. She disputed the report that the surgery had helped her and stated that since the surgery, she had also developed difficulty swallowing for unclear reasons.

She stated she takes Cymbalta for depression and fibromyalgia for 8 to 9 years, and has an appointment to see a psychiatric physician. When she has headaches, she has to be in a dark quiet room. She takes Tylenol PM and knocks herself out.

Her hand limitations have worsened since her surgery, and she has difficulty writing, dressing, applying makeup, and holding a coffee cup. She awakens with

> her hands numb. She has difficulty lifting her arms over her head, and can only lift to shoulder level in front. These problems developed after her recent surgery. She has difficulty concentrating because of pain and medications. She has to get up 15 minutes into watching a program to walk around, and stands twice an hour to readjust her position. Since her surgery, her right arm hurts even when she's not using it. She is no longer able to run the vacuum. She has discussed referral to pain management but does not want to opiate medications. The claimant has been referred to a rheumatologist and may have injections.

(Tr. 26–27).

### B. Relevant Medical Evidence

The ALJ issued two decisions that summarize the relevant medical evidence concerning Plaintiff's impairments, one on March 2, 2018, and one on December 5, 2018.

*1. Medical evidence from January 31, 2012 through February 18, 2018*

In finding that Plaintiff was not disabled prior to February 19, 2018, the ALJ reviewed the relevant evidence:

> The claimant reported to her nurse practitioner in February 2012 that she had neck pain with radiation to her shoulder, along with numbness and tingling in her arms and hands. On examination, the claimant had subjective tenderness and some decreased range of motion. Edema was absent. Moreover, while she had a deficit in sensation, she had normal strength, normal reflexes, and no cranial nerve deficit. Range of motion was also normal in her shoulder (Exhibit 8F, pp. 12–13).

> The claimant consulted with Dr. Brent Miller in August 2012 due to complaints of neck pain and bilateral upper limb pain and tingling. On examination, the claimant had subjective pain with neck range of motion (extension greater than flexion), as well as decreased sensation in the ulnar nerve distribution on the right. However, she had full range of motion in her shoulders with negative impingement testing, as well as no atrophy or weakness noted and no ataxia with normal fine motor control (Exhibit 24F, p. 2).

> An electromyography and nerve conduction study in August 2012 revealed mild ulnar neuropathy around the left elbow segment without evidence of axonal loss and right C7 radiculopathy (Exhibit 24F, p. 5). An MRI of the claimant's cervical spine in August 2012 showed reversal of the normal cervical lordosis with multi-level degenerative arthrosis. The imaging also showed disc height loss at the C3-4, C4-5, C5-6, and C6-7 levels with mixed soft disc and spondylotic abnormalities at each of these levels resulting in light contouring or flattening of the cord (Exhibits 1F and 24F, p. 6).

In November 2013, the claimant had some subjective pain and stiffness on examination; however, she had a normal range of motion and no notable spasm (Exhibit 8F, p. 35). The claimant consulted with Dr. Chow of Columbus Arthritis Center in December 2013. While the claimant had subjective tenderness in several joints, there were no additional positive exam findings noted (Exhibit 11F, p. 25).

During an evaluation in January 2014 with Dr. Hannallah of Orthopedic One, the claimant reported that about 90 percent of her pain was in her neck, with some radiation down to her trapezial region and shoulder. She also reported bilateral "vague upper extremity parasthesias." On examination, the claimant had some paraspinal tenderness. However, she had no midline cervical tenderness, no shoulder impingement on either side, and no focal upper extremity weakness. She also had normal upper and lower extremity reflexes, range of motion, strength, sensation, and perfusion (Exhibit 3F). Likewise, during a follow-up appointment in September 2014 with Dr. Hannallah, the claimant had only some paraspinal tenderness; there was no midline cervical tenderness and she had a coordinated gait, normal strength, and normal reflexes (Exhibit 5F).

In February 2015, the claimant underwent an initial evaluation with chiropractor James Heaton. On examination, the claimant had some reduced range of motion in her cervical spine (Exhibit 7F). During a follow-up appointment with Dr. Hannallah in May 2015, the claimant complained of pain in her neck, shoulders, elbows, and wrists. While the claimant had some weakness in her grip and paraspinal tenderness, the claimant had no midline cervical tenderness. She also had good strength and motion in her elbows, normal range of motion, and normal sensation (Exhibit 9F).

X-rays of the claimant's bilateral knees and feet in June 2015 were normal. X-rays of the claimant's bilateral hands in June 2015 revealed mild to moderate degenerative changes of the bilateral first CMC joints (Exhibit 11F, p. 31). An x-ray of the claimant's cervical spine in July 2015 showed multi-level intervertebral disc space narrowing (most severe at CS-6 and C6-7), grade 1 anterolisthesis, and joint arthropathy (Exhibit 11F, p. 13).

An MRI of the claimant's cervical spine in November 2015 demonstrated severe disc space narrowing at C3-4 through C7-T1, disc protrusions at C3-T1, central canal and foraminal stenosis, and scoliosis (Exhibit 17F). X-rays of the claimant's cervical spine in March 2016 showed reversal of the normal lordotic curvature with a kyphosis centered at C3-4, multi-level degenerative changes, anterolisthesis of C2 and C3 on C4 and retrolisthesis of C7 on Tl (Exhibit 20F, p. 5). However, an examination in March 2016 showed normal range of motion in the lumbar spine with no tenderness. Moreover, range of motion of the cervical spine was also full and minimally painful to flexion, extension, lateral bending, and rotation. The claimant also had full strength in the upper extremities and lower extremities.

Additionally, she had a negative straight leg raise and normal sensation to light touch in the upper and lower extremities (Exhibit 26F, pp. 7–8).

In April 2016, the claimant's primary care physician, Dr. Bharmal, indicated that the claimant had some quadriceps weakness on the left and right, some decreased sensation of the left arm and hand, and 4/5 muscle strength of the left upper extremity. However, the claimant had normal range of motion and no tenderness in the lumbar spine, normal sensation in the lower extremities, a negative straight leg raise, and normal elbow reflexes (Exhibit 22F, p. 29). An examination at Columbus Arthritis Center in August 2016, demonstrated the claimant only had "mild" osteoarthritis in the left hand and diffuse myofascial tenderness (Exhibit 21F). By January 2017, the claimant had some decreased strength of the left hand grip and some muscle spasm and contracture in the neck and shoulders, but also had a normal gait, intact sensation, and full reflexes (Exhibit 22F, p. 15).

An MRI of the claimant's cervical spine in March 2017 revealed multi-level cervical spondylosis with central canal stenosis at C4-5, C5-6, and C6-7, along with foraminal narrowing (Exhibit 19F). An x-ray of the claimant's spine in July 2017 showed dextroscoliosis of the thoracic spine and levoscoliosis of the lumbar spine (Exhibit 26F, p. 50). However, during an appointment at OSU Comprehensive Spine Center in July 2017, the claimant denied decreased walking tolerance, gait instability, or fine motor change. On examination, the claimant had mild right tenderness to palpation in the lateral epicondyle; however, there was 5/5 strength in the bilateral upper extremities and full reflexes. In the lumbar spine, the claimant had full range of motion, no tenderness, and no spasm. She had 5/5 strength in the bilateral lower extremities, a negative straight leg raise, and full reflexes. The claimant also had no gait deficits (Exhibit 26F, p. 53).

A CT scan of the claimant's cervical spine in August 2017 revealed complete reversal of the normal lordosis and cervical spondylosis with mild central canal stenosis noted at C3-4 with evidence of multi-level foraminal narrowing (Exhibit 20F, p. 1). While the claimant complained of significant musculoskeletal pain in multiple areas during an examination in August 2017, she had a normal gait and no other noted positive exam findings (Exhibit 22F, p. 5).

An electromyography and nerve conduction study in September 2017 showed the claimant had right median neuropathy at the carpal tunnel of mild-to-moderate severity with potentially a "very mild" left median neuropathy (Exhibit 23F, p. 6).

In terms of treatment, the record shows the claimant's treatment has been relatively conservative with modalities including medications, therapy, injections, and radio frequency ablation (Exhibits 4F-6F and 26F). She began physical therapy in July 2015; however, she cancelled or was a no-show to 4 of her 8 appointments (Exhibit 14F). The lack of attending appointments suggests that the claimant's symptomatology was tolerable.

5

(Tr. 149–51).

> The claimant underwent preoperative assessment in November 2017, in connection with her anticipated anterior/posterior C2-T3 decompression and fusion. *The claimant reported that she was able to perform household duties, go up two flights of stairs, and walk one block around the neighborhood.* Chest x-ray showed no active disease in the chest but did identify S-shaped scoliosis. The claimant was observed to be in no distress. Examination of the neck showed normal range of motion, a supple neck, and no evidence of tracheal deviation or thyromegaly.
>
> Echocardiogram showed a low normal ejection fraction of 52 to 55% and a trivial pericardial effusion. Occiput and radiating into the bilateral trapezius muscles. There was right arm pain that seem to focus of the lateral epicondyle without radiation or shooting. After the surgery was delayed for personal reasons, the claimant was evaluated again in February 2018, with no material changes in the initial findings (Exhibit 29F).

(Tr. 25–26).

> *2. Medical evidence post-February 18, 2018*

The ALJ also considered Plaintiff's medical records and symptoms after the date on which he concluded Plaintiff became disabled, February 19, 2018:

> The claimant was hospitalized on her established onset date of disability, in order to undergo multilevel cervical fusion because of cervical stenosis of the spinal canal. She underwent stage I anterior cervical depression discectomy and fusion from C3 through C6, and stage II posterior cervical fusion from C3 through T1. Her physician noted that she had severe cervical kyphosis secondary to remote trauma with advanced degenerative changes. She had difficulty with horizontal gaze due to her severe cervicogenic kyphosis (Exhibit 30F/28). When seen postoperatively, a physician's assistant indicated that the claimant was doing well with her pain well controlled and no use of an ambulatory assistive device. Her preoperative neck and arm pain had improved. She noted some difficulty swallowing with solids but thought it was improving. Strength, sensation, and reflexes were intact in the upper extremities *(Id.,* at 64).
>
> Three weeks after surgery, the claimant was seen in the emergency room for left-sided facial swelling and paresthesias that began earlier in the day. CT of the neck should concerns for swelling but there was no obvious fluid collection suggestive of abscess. X-ray of the cervical spine showed intact hardware. She was diagnosed with dependent edema secondary to sleeping on the side of her face (Exhibit 37F/74–80).

Dr. Bharmal saw the claimant in March 201[8], in surgical follow-up. The claimant was in the surgical ICU for four days postoperatively and was uncertain how long she was intubated. She said she could not swallow foods normally now and could only take small bites of solids. She had a transient episode of left facial droop and swelling, but did not have postoperative infection. Her pain was being managed well. Her neck was supple and her incision was clean (Exhibit 38F/17–19). In May, the claimant complained that her right shoulder blade was swollen and painful, with pain radiating around her chest and under her arm. She was unable to sleep. Her dominant left hand and wrist were also swollen and painful, and she continued to have difficulty swallowing since surgery. On examination, the right scapula displayed slight "winging" compared to the left and was tender. The left wrist and thenar eminence were swollen and tender *(Id.,* at 10–12). Later that month, the claimant reported 8–10/10 neck pain, as well as back and shoulder pain, severe pain, weakness, and dysfunction of the left hand, and recurrent low back pain causing immobility. Examination showed right shoulder pain with movement, tenderness in the left shoulder and pain with movement, swelling, tenderness, and pain to palpation in the left wrist, reduced range of motion and tenderness in the cervical and lumbar spine *(Id.,* at 8). In August, the claimant requested a referral to pain management, and reported headaches *(Id.,* at 2).

Throat physician Jeffrey Hildebrand, M.D., saw the claimant in May 2018 for dysphagia. She said difficulty with swallowing occurred mainly with dry foods. When she looked down it felt like her throat was closing. She said she was intensive care unit for one week postoperatively and had been intubated. Her voice and slowly improved, as had swallowing, but her problems had plateaued in the past 4 to 6 weeks. Sometimes foods get stuck in her throat. She received flexible laryngitis get the, which showed mobile vocal cords and no acute abnormalities. She was diagnosed with dysphonia, dysphasia, and tobacco use (Exhibit 31F). She underwent a FEES swallowing study, designed to evaluate the throat aspect of the swallowing mechanism, which was normal (Exhibit 33F/22, 25). Barium swallow showed adequate swallow function with no oropharyngeal deficits *(Id.,* at 27).

Physical therapy evaluation was performed in May 2018 because of persistent right shoulder and scapula pain, bilateral upper extremity numbness and pain, and neck pain. She stated that she had constant pain and tightness in her neck and her headaches were worse since surgery, primarily at the base of her head. She had bilateral hand pain, but was not sure if that was related to neck problems her arthritis. She also had low back and left hip pain that had been present since prior to surgery, but she felt it had been worsening. She was taking Flexeril and tramadol for pain, and occasional Percocet for severe headaches. It was difficult for her to turn her head, or to reach and lift with her arms. Elbow, thumb, and wrist strength was decreased bilaterally on examination.

The claimant showed extensive postural alignment problems including scoliosis and recent fusion (Exhibit 39F/2–5). At her discharge summary two months later,

there was no improvement in her ability to sleep or reach. She said she was having more difficulty using her hands for daily activities. The therapist estimated that the claimant was 60–80% impaired/limited/restricted, with regard to her initial complaints *(Id.,* at 45). The physical therapist's opinion is given limited weight, as the physical therapist is not considered an acceptable medical source, and she did not include specific limitations and functional abilities related to the claimant's impairments/restrictions in her conclusions. The report is accepted as support for the finding that the claimant's impairments have worsened since her established onset date of disability.

Treatment notes from Dr. Bharmal in August 2018 show the claimant's report that two months of physical therapy did not help at all. Her neck pain was consistently 8–10/10 in severity, in the neck, back, and shoulder blades. She also experienced weakness and dysfunction of the left hand, and recurrent low back pain. She had pain in the joints of her hands and had been evaluated from arthritis, but was told she did not have rheumatoid arthritis (Exhibit 34F/4).

### C. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through December 31, 2019 and had not engaged in substantial gainful employment since her alleged onset date of January 31, 2012. (Tr. 21). He further determined that since the alleged onset date of disability, January 31, 2012, Plaintiff has had the following severe impairments: a cervical spine impairment characterized as degenerative disc disease, spondylosis, facet arthropathy, and radiculopathy; carpal tunnel syndrome; and bilateral thumb arthritis. Beginning on the established onset date of disability, February 19, 2018, Plaintiff has had the following severe impairments: a cervical spine impairment characterized as degenerative disc disease with a history of multilevel, spondylosis, facet arthropathy, and radiculopathy; carpal tunnel syndrome; headaches, and bilateral thumb arthritis. (*Id*.). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 24).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record, the [ALJ] finds that prior to February 19, 2018, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant must be allowed to stand and walk for one minute

8

> after sitting for an hour (this change of position can be combined with the customary breaks or other workplace tasks). The claimant can occasionally stoop, kneel, crouch, and climb ramps and stairs. She can frequently balance, handle, and finger, but she is precluded from climbing ladders, ropes, and scaffolds and from crawling. The claimant must also avoid workplace hazards, such as unprotected heights and machinery. The claimant would be off task 5 percent of the workday in addition to the usual breaks.

(Tr. 25).

After reviewing the prior administrative decision, hearing testimony and medical record, the ALJ concluded that "[t]he location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors are adequately addressed and accommodated in the above residual functional capacity." (Tr. 26).

The ALJ then turned to the opinion evidence. As to treating primary care physician Dr. Bharmal, the ALJ determined:

> Dr. Bharmal provided a medical source statement form dated July 2018, in which she indicated that, since April 13, 2016, the claimant was unable to sit at a desk, use a computer, stand, lift, or use her hands (Exhibit 32F). On another form, dated October 17, 2018, the second of which appears to correct errors and "cross outs" on the first. She also provided a clarifying memorandum five days later (Exhibits 35F, 36F, 41F). On the forms, she endorsed selections indicating that the claimant would constantly experience pain and other symptoms significant enough to interfere with attention, concentration, persistence, and pace for both simple and complex work-related tasks. She indicated that the claimant could sit for two hours at one time and stand for 30 minutes at one time before needing to change position. In an eight-hour workday, the claimant could sit, stand, and walk for less than two hours. She stated that the claimant could handle and finger frequently with the right hand and constantly with the left hand. She expected the claimant to be absent more than four days a month due to her impairments. She expected the claimant to have good days and bad days. On a bad day, she would be unable to do anything, but on her best day, she could sit for two hours, use a computer for 30 minutes, and could not use a phone. On the corrected form, she indicated the claimant could occasionally handle and finger with both hands. On the memorandum, she stated that the claimant experienced constant pain in her neck, shoulder, arms, hands, and upper back. She was limited to occasional use of both hands for occasional handling and fingering throughout the day.
>
> Dr. Bharmal appears to be a treating source within the meaning of 20 CFR §416.927. The opinion of a treating source is entitled to controlling weight where

> it is well supported by and not inconsistent with objective clinical and laboratory findings (Social Security Ruling 96-2p). However, this assessment is not entitled to that degree of probative consideration prior to the established onset date of disability, as it is inconsistent with other evidence of record, as described in the Administrative Law Judge decision of March 2, 2018 (Exhibit 5A). It is also inconsistent with her report to anesthesiologist in November 2017, in which the claimant reported that she was able to perform household duties, go up two flights of stairs, and walk one block around the neighborhood (*See* Exhibit 29F). However, her opinion is accepted as of the established onset date of disability, in so far as it supports the more conservative restrictions in the residual functional capacity above, which reflects the claimant's abilities and limitations following her February 19, 2018 surgery.

(Tr. 28–29).

Relying on the VE's testimony, the ALJ concluded that Plaintiff was able to perform her past relevant work as a senior vice president prior to February 19, 2018, but as of that date, her RFC prevented her from being able to perform her past relevant work. (Tr. 29–30). The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act prior to February 19, 2018, but she became disabled on that date and has continued to be disabled since that time. (Tr. 31).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v.*

*Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff challenges the ALJ's finding that she was not disabled prior to February 19, 2018. According to her, the ALJ allegedly failed to provide good reasons for discounting the opinion of Plaintiff's treating physician, Dr. Bharmal. (Doc. 8 at 7–12). Further, she argues, the ALJ's conclusion that Plaintiff was not disabled prior to February 19, 2018, was not supported by substantial evidence. (*Id.* at 12–17). The Undersigned addresses each alleged error in turn.

### A. Treating Physician

Two related rules govern how the ALJ was required to analyze Dr. Bharmal's opinions. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).[1] The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL

---

[1] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016).

11

860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that her physician has deemed her disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id.* "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,'" courts "have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely* 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Dr. Bharmal completed a number of medical source statements during the course of her treatment of Plaintiff. In an April 2016 statement, Dr. Bharmal opined that Ms. Maxson suffers

from cervical disc disease with stenosis and spondylosis. (Tr. 602). She noted that Plaintiff experienced daily pain, numbness, and tingling. (*Id.*). She further found that Ms. Maxson was restricted to no prolonged sitting or standing which was described as no longer than an hour and that this restriction would be in place for approximately a year. (Tr. 602–03).

Two years later, in July 2018, Dr. Bharmal completed another medical source statement. (*See* Tr. 923–24). She observed that Plaintiff suffered from multiple diagnoses such as cervical scoliosis, cervical spondylosis, thoracic scoliosis, neck pain, back pain, and fibromyalgia. (Tr. 923). Plaintiff's symptoms included neck pain, shoulder pain, decreased strength and numbness in the hands. (*Id.*). Dr. Bharmal further noted that Plaintiff's health had deteriorated since 2012 and that she would have a number of restrictions on her ability to work, including being unable to sit at a desk, use a computer, stand, lift, or use her hands. (Tr. 923–24). She concluded that these restrictions would need to be in place for at least a year. (Tr. 924). Finally, she opined that Plaintiff could not work in another occupation that did not require the restrictions noted above. (*Id.*).

Shortly thereafter, Dr. Bharmal provided two additional medical source statements clarifying her findings in the July 2018 statement. (Tr. 969–77). She opined that Plaintiff's pain would "constantly" interfere with Plaintiff's ability to perform simple work-related tasks. Further, she indicated that Plaintiff had significant functional limitations, including that she could stand for no more than two hours in an eight-hour work-day and that she could sit for no more than two hours in an eight-hour work-day. (Tr. 976). Dr. Bharmal found that, on a good day, Plaintiff could sit for no more than two hours, could not use the phone, and could use a computer for thirty minutes. (Tr. 977). On a bad day, Dr. Bharmal opined, Plaintiff would be unable to do anything. (*Id.*). Finally, she concluded that Plaintiff would be absent from work more than four days a

13

month. (*Id.*).

The ALJ concluded that Plaintiff was disabled following her February 19, 2018 surgery, well after Plaintiff's alleged onset date of disability. (Tr. 29). As a result, he discounted Dr. Bharmal's opinion evidence from the time period prior to that date, but he "accepted" Dr. Bharmal's 2018 opinion evidence as being consistent with his conclusion that Plaintiff was disabled as of February 2018. (*Id.*).

Discounting Dr. Bharmal's 2016 opinion evidence, the ALJ explained that it was "inconsistent with the other evidence of record, as described in" his March 2, 2018 decision. (*Id.*). Further, he noted Dr. Bharmal's 2016 opinion evidence was inconsistent with her report to Plaintiff's anesthesiologist in 2017. (*Id.*).

Remand is appropriate here. "An ALJ fails to provide good reasons when the ALJ discounts a treating-source opinion without articulating the weight given to it." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (citing *Blakley*, 581 F.3d at 408); *see also Cole*, 661 F.3d at 937 (6th Cir. 2011) (holding that, in order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). "[A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2P, 1996 WL 374188, at *4 (S.S.A. July 2, 1996). "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." *Id.* "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not

14

meet the test for controlling weight." *Id.*

The ALJ's decisions do not make clear what, if any, weight he gave to Dr. Bharmal's opinion. In his decisions, the ALJ found only that Dr. Bharmal's opinion were not entitled to controlling weight. (*See* Tr. at 29 (recognizing that treating physician's opinions are entitled to controlling weight if they are well supported by objective clinical and laboratory findings, but concluding that Dr. Bharmal's opinion was "not entitled to that degree of probative consideration prior to the established onset date of disability" because it was "inconsistent with other evidence of record"); Tr. 152 (discounting Dr. Bharmal's opinion without explaining the weight given to it)). But that does not mean her opinion was entitled to no weight at all. *See* SSR 96-2P, 1996 WL 374188, at *4. And absent an explanation of what weight the ALJ assigned Dr. Bharmal's opinion, the Undersigned is unable to conduct a "meaningful review" of his decision finding that Plaintiff was not disabled prior to February 19, 2018, *Wilson*, 378 F.3d at 544.

"Because the reason-giving requirement exists to ensure that each denied claimant receives fair process," the ALJ's failure to identify the weight given to Dr. Bharmal's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record." *Blakely*, 581 F.3d at 407 (citation, internal quotations, and internal alteration omitted). Defendant failed to satisfy the good reasons requirement as a result when analyzing Plaintiff's claim that she was disabled prior to February 19, 2018.

This failure was not harmless error. Defendant's "failure to follow the Agency's procedural rule does not qualify as harmless error where" a court "cannot engage in 'meaningful review' of the ALJ's decision." *Blakely*, 581 F.3d at 409 (quoting *Wilson*, 378 F.3d at 544). And even if the Undersigned found that substantial evidence supported the ALJs weighing of Dr. Bharmal's opinion, "substantial evidence alone does not excuse non-compliance with 20 C.F.R.

15

§ 404.1527(d)(2) as harmless error." *Blakely*, 581 F.3d at 409 (citing *Wilson*, 378 F.3d at 546).

Because proof of disability is not overwhelming, the Undersigned recommends remanding this matter for a rehearing rather than awarding Plaintiff benefits. *See Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 923–24 (S.D. Ohio 2016).

### B.  Remaining Assignment of Error.

Because the ALJ's analysis of Dr. Bharmal's opinion supports remand, the Undersigned need not address Plaintiff's other argument.  If the Court adopts this Report and Recommendation, on remand, the Commissioner may wish to address Plaintiff's other alleged error.

## IV.  CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## V.  PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: October 29, 2020 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE